## UNITED STATES v. PARNELL.

No. 6478.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 16, 1952.

Decided Nov. 10, 1952.

Onan A. Hydrick, Atty. Department of Justice, Washington, D. C. (John C. Williams, U. S. Atty., Frank E. Jordan, Jr., Asst. U. S. Atty., Greenville, S. C., Holmes Baldridge, Asst. Atty. Gen., D. Vance Swann, and Russell Chapin, Attys. Department of Justice, Washington, D. C., on brief), for appellant.

W. H. Nicholson, Jr., Greenwood, S. C. (Nicholson & Nicholson, Greenwood, S. C., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal by the United States in a war risk insurance case in which there was a verdict and judgment for the plaintiff. The policy was issued on the life of one J. C. Parnell while he was in the military service. He was discharged from the service on November 29, 1943 after a period of hospitalization, and premiums were paid on the policy by allotment through December 31, 1943. The thirty-one day grace period provided coverage through January 31, 1944. No further premiums were paid and the insured died May 11, 1945. The only question in the case is whether the insured was continuously and totally disabled from January 31, 1944 to his death. Defendant moved for a directed verdict on the ground that the evidence did not warrant an affirmative answer to that question. We think that the judge erred in not granting this motion.

The facts in the case are that insured enlisted in the army in 1940. In December 1942 he sustained a serious head injury as the result of a kick from a mule while serving in the Southwest Pacific and was hospitalized for about three weeks. He returned to his company and was under fire but in June 1943 was again hospitalized because of headaches from which he was suffering and was returned to the United States where, after spending a time in a government hospital, he was discharged from the service on November 29, 1943. He was married on December 18, 1943 and in the latter part of January 1944 went to work in a textile mill, where he continued to work for more than fifteen months

or until his death on May 11, 1945. During this period of 69 consecutive weeks he had a work record averaging over 48 hours of work per week, and in only seven of the 62 weeks prior to April 1945 did he fail to work more than 40 hours per week and in only two less than 35 hours per week. He received a promotion during this period of service. His average pay was $28.11 per week during the first quarter of his service, $34.89 per week during the second quarter, $33.21 per week during the third quarter, $42.88 per week during the fourth quarter, and $34.16 per week during the fifth quarter. Not until May 1, 1945 did his earnings fall below $22 per week.

Insured suffered from nervousness and headaches from the time of his discharge from the army, and was examined from time to time by government physicians. The reports of these physicians are in evidence and show that the complaint of insured at the time of the examination was that he was suffering from nervous spells and headaches and that the diagnosis of the physician was psychoneurosis. The reports did not show a disability of sufficient degree to entitle insured, in the opinion of the examining physician, to vocational and rehabilitational treatment. Insured's condition grew worse about two weeks before his death, and on the evening of May 11 he suffered an attack from which he became unconscious and died within a very short time. The physician who was called to attend him signed a death certificate in which he stated that the cause of death was acute alcoholism and possible ptomaine poisoning. This physician later signed a statement that, on the basis of evidence subsequently submitted, he was of the opinion that death was caused by epilepsy instead of acute alcoholism. There is no evidence in the record, however, that insured had ever been thought to be afflicted with epilepsy prior to that time.

One physician examined in behalf of plaintiff gave as his opinion that insured was suffering from epilepsy and that, if so, he should not have worked when having attacks but that he was capable of working when not suffering from headaches and

that the work he was doing in the textile mill did not aggravate his condition or endanger his life. Another physician testified that, if he had convulsions he should not have worked in a position that required him to meet a schedule or subjected him to nervous strain, but that it was not objectionable from a medical standpoint for a man afflicted even with epilepsy to engage in work. While there was evidence from which the jury would have been justified in finding that insured's death resulted from the head injury received in the service, there is none that this injury resulted in continuous total disability throughout the period that the premiums on the policy remained unpaid. There is evidence that insured was incapacitated for work when he had headaches and nervous spells but none that this incapacity was continuous. There is no evidence that the work that insured did aggravated his condition or had anything to do with his death.

The evidence shows that insured, after consultation with his wife, decided not to keep up the war risk insurance policy because he felt that he was not able to pay the premiums. He consequently allowed this policy, which was payable to his sister, to lapse for nonpayment of premiums and took out two small policies, one an industrial insurance policy, both payable to his wife. Not until more than five years after his death was this suit instituted.

■ On these facts, we think it clear that verdict should have been directed for the government. The question involved is not whether insured died of epilepsy or whether the cause of death was the result of military service, but whether he was continuously and totally disabled throughout the 15 months period when the premiums on the policy remained unpaid. He was undoubtedly suffering from a disability which was disabling at times; but on no possible view of the evidence could it be held to be continuous total disability within the meaning of the policy, which is defined as "any impairment of the mind or body which continuously renders it impossible for the insured to follow any substantial gainful occupation". Veterans Administration Regulation 3443, 38 C.F.R. 8.43.

[2-4] It ■ true, of course, that the mere fact that an insured works when physically unable to do so does not negative the existence of the required disability. Carter v. United States, 4 Cir., 49 F.2d 221. And the question is one for the jury where there is substantial evidence that the insured was not able to work with any reasonable regularity at any substantially gainful employment. Berry v. United States, 312 U.S. 450, 61 S.Ct. 637, 85 L.Ed. 945. The evidence here, however, is that insured worked at a substantially gainful occupation during practically the entire fifteen months period that the premiums remained unpaid, and that work was not only not harmful but was beneficial to him. The evidence of the physician to the effect that, if insured had convulsions, he should not have worked where he would have been under a strain to meet a schedule, is not sufficient to carry the case to the jury for the reason that there was no substantial evidence of convulsions and, even if there had been, there was no evidence that insured could not have worked at some occupation where he would not have been subjected to such strain. At most, the evidence shows mere partial disability or disability for a small part of the time or for particular occupations; and this is not sufficient. As said in Miller v. United States, 294 U.S. 435, 440–441, 55 S.Ct. 440, 442, 79 L.Ed. 977:

"The burden was on petitioner not only to show the character and extent of his injury, but also to show that the result of the injury was to disable him permanently from following any substantially gainful occupation. * * * The mere fact that he was unable to follow the occupation of surveyor or to do work of the kind he had been accustomed to perform before his injury does not establish the permanent and total character of his disability."

Lumbra v. United States, 290 U.S. 551, 54 S.Ct. 272, 275, 78 L.Ed. 492, was a case involving grand mal epilepsy. In holding that a verdict should have been directed in

that case against a claim of total and permanent disability, the Supreme Court said:

> "The phrase 'total permanent disability' is to be construed reasonably and having regard to the circumstances, of each case. * * * The various meanings inhering in the phrase make impossible the ascertainment of any fixed rules or formulae uniformly to govern its construction. That which sometimes results in total disability may cause slight inconvenience under other conditions. Some are able to sustain themselves, without serious loss of productive power, against injury or disease sufficient totally to disable others. It cannot be said that injury or disease sufficient merely to prevent one from again doing some work of the kind he had been accustomed to perform constitutes the disability meant by the act, for such impairment may not lessen or affect his ability to follow other useful, and perchance more lucrative, occupations."

See also United States v. Spaulding, 293 U.S. 498, 55 S.Ct. 273, 79 L.Ed. 617; United States v. Still, 4 Cir., 120 F.2d 876; Cartey v. United States, 5 Cir., 86 F.2d 139; Queen v. United States, 4 Cir., 105 F.2d 146; United States v. Derrick, 4 Cir., 83 F.2d 99; United States v. Farnsworth, 4 Cir., 77 F.2d 91; United States v. Carper, 4 Cir., 75 F.2d 191; United States v. Legg, 4 Cir., 70 F.2d 106. The last two cases involved epilepsy.

We do not regard the decision in Halliday v. United States, 315 U.S. 94, 62 S.Ct. 438, 86 L.Ed. 711, as to the contrary. An important point in that case, which does not arise here, was whether the testimony of a physician that insured was totally and permanently disabled was sufficient to take the case to the jury. There was evidence, also, that the insured there was "a complete physical and mental wreck, very badly torn up mentally and physically" and unable to do a full day's work.

For the reasons stated, the judgment appealed from will be reversed.

Reversed.